J. T. FLAGG KNITTING CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15502. Promulgated March 23, 1949.

*H. C. Kilpatrick, Esq.*, and *Frederick A. Ballard, Esq.*, for the petitioner.
*S. Earl Heilman, Esq.*, for the respondent.

OPINION.

VAN FOSSAN, *Judge*: The respondent on brief concedes that Flagg's selling activities were considerable and that he devoted a large portion of his time to selling the products of petitioner.  He also concedes that the evidence shows that the selling of a product of a knitting mill through a sales agency on a percentage basis is not unusual, particularly where the sales volume does not exceed that attained by the petitioner during 1941, 1942, and 1943, and that such is considered a sound business arrangement.  He states that he has not and does not now contend otherwise.  He further states as follows:

> There is no reason why the Commissioner should object to any such arrangement unless the officer in question receives a total compensation, including the amounts received indirectly through the sales agent as a conduit, which is in excess of that which is reasonable.  In the instant case, however, that was precisely what the Commissioner determined.

Thus his contention is that in the present case the portion of the commissions which the petitioner paid to Roman and which in turn Roman paid over to Flagg, petitioner's chief stockholder and chief officer, for services rendered, were in fact part of the compensation paid by petitioner to Flagg and that such payments by Roman to Flagg actually represent excessive compensation paid by petitioner to Flagg for services to the extent of $31,557.86, $83,658.49, and $79,088.48 in the years 1941, 1942, and 1943, respectively.  He disallowed the deduction of such amounts in computing the tax liability of petitioner.  His determination and entire argument are based upon the proposition that substance rather than form governs in the law of Federal taxation.

Accepting respondent's argument, and regarding the commissions paid to Flagg by Roman as compensation paid by petitioner to Flagg for his selling activities, the fact that the amount of commissions paid to him in the taxable years increased as the result of greater sales is not decisive, nor is it an adequate reason for disallowing the commissions as business expense deductions unless the rates of commission fixed by the contract were unreasonable and unless Flagg was not responsible for the increased volume of sales or a goodly share thereof.

The respondent does not question that taxpayer and Roman were separate and distinct entities.  Neither does he question the selling

expense as such. He concedes that the rates or amounts of commissions paid to Roman were no more than usually paid to a sales agent. Apparently it is only the fact that Flagg was employed by Roman as a salesman that moved respondent to his determination.

It is true, as argued by respondent, that in *Alexander Sprunt & Son, Inc.*, 24 B. T. A. 599, respondent's action in disallowing $286,-071.30 of a claimed deduction of $336,554.48 was approved. However, in that case the latter amount was paid by taxpayer, under the guise of commissions, to a new Bremen, Germany, partnership composed of fourteen holders of all the outstanding common stock of taxpayer, only one of whom was actively engaged in the affairs of the taxpayer in Europe and spent about one-half of his time in Bremen attending to the affairs of the old and new Bremen firms, the old firm being in the process of liquidation. Two of taxpayer's executive officers and members of both Bremen firms made several trips to Europe for the purpose of assisting in the liquidation of the affairs of the old Bremen firm and of further developing and retaining the business of the firm for taxpayer's benefit. In the opinion, it is stated:

> The record does not show that the new Bremen firm was directly responsible for a single dollar's worth of petitioner's sales in 1923, that is, that the members of the firm consummated a single dollar's worth of sales for the petitioner's benefit. * * * The fact that the payments made to the Bremen firm were not in excess of the commissions usually paid to selling agents does not of itself prove the reasonableness of these payments. The question is, was the total amount paid reasonable for the services rendered by the Bremen firm to the petitioner; and the answer must be in the negative, since the *evidence is far from convincing that the firm rendered any services of substantial benefit to the petitioner.* * * * [Emphasis supplied.]

The decision of the Board on this issue was affirmed by the Circuit Court of Appeals for the Fourth Circuit, 64 Fed. (2d) 424.

It is to be noted that in the same case the Commissioner had also disallowed the deduction of net commissions of $39,689.75 on sales made within the year credited to the account of a French corporation acting as petitioner's selling agent in France. As to this issue the Board stated:

> * * * We think that the respondent's determination in this matter is erroneous. The evidence leaves no room to doubt the separateness of the two corporations, and there is no indication of fraud, attempt at tax evasion, or other circumstance which might justify or require a disregard of the separate corporate entities. The allowance of commissions to the French corporation could hardly be termed distributions of profits, since the corporation owned none of the petitioner's capital stock. The only question which might arise in connection with these commission allowances would be the matter of the *bona fides* of the allowances, and as to that, the evidence shows clearly that *the allowances were made for services actually rendered in the consummation of sales for peti-*

*tioner's benefit, and were computed at rates customarily allowed to petitioner's other selling agents.* They represent a proper charge against the petitioner's gross sales as a part of their cost, and are a proper deduction in computing net income. [Emphasis supplied.]

No appeal was taken by the Commissioner from the decision on this issue.

Herein it is shown that Flagg was, during the taxable years, the president and administrative head of petitioner. The petitioner was established in Florence, Alabama, primarily through the efforts of Flagg. Until September 1930 he devoted himself to the building and establishment of a well functioning manufacturing plant. However, to be successful financially the plant needed a greater outlet for its products. Flagg then made his first arrangement for selling such products with the Campe Corporation on a salary basis. An arrangement whereby an official of a mill is employed by the sales agent of the mill, either on a salary basis or on a commission basis or both, was not uncommon in the textile or knitting goods industry. It had been the practice of the president of petitioner's predecessor, the company located at Amsterdam, New York. Furthermore, from the very outset, and all during the time the organization of petitioner was discussed, it was understood that the salary paid to the president was not to include compensation for selling activities. Such compensation was to be obtained through a collateral arrangement with the sales agency. Thus the selling activities of the president were not services to petitioner ordinarily required and expected of him as president of taxpayer.

For his services as president and administrative head of petitioner, Flagg was paid $5,200 in 1941 and 1943 and $5,300 in 1942, which amounts were not questioned by respondent nor classed within the excessive compensation disallowed as such. On March 1, 1939, well before petitioner's prosperous years, petitioner entered into the agreement with Roman.

The rates of commission paid by petitioner to Roman were not in excess of rates of commission usually paid to sales agents in the same field. No question was raised by respondent either as to the total paid to Roman or as to the amount paid to Flagg by Roman in 1939 and 1940. There can be no question on the record that Flagg was a valuable and a vital element in petitioner's success. He devoted his entire time to the affairs of petitioner, the greater part of his time being spent in sales activities. During the taxable years the bulk of petitioner's products was produced for and sold to the Government. The sales on which commissions were paid by petitioner to Roman in 1941, 1942, and 1943 amounted to $4,012,509.60, $5,568,799.37, and $5,832,715.60, respec-

tively.   Of such sales, more than $3,170,000 in 1941, $5,064,000 in 1942, and $5,432,000 in 1943 were Government sales.   Contracts covering such sales were obtained and handled by Flagg.   The responsibility for getting and handling Government contracts fell to Flagg because of his prior experience in that field.   Roman agreed that Flagg's commission be increased from 1½ per cent to 2 per cent.   Roman handled practically all of the civilian sales and assisted in servicing Government contracts.   The division between Flagg and Roman of the commissions agreed to be paid by petitioner to Roman was originally based upon the estimated sales each could produce.   This arrangement was continued.   When Roman gave up the two mills for which he had been selling, in order to devote more time to the sales of petitioner, his share of the commissions was increased, but when the sales to the Government increased, they went back to the original arrangement, because it "entailed more work on Mr. Flagg's part," as testified by Roman.

The commission was not based upon the net profits of petitioner, but on the volume of business or sales brought to the mill by the sales agent.   Such sales were produced and consummated through the efforts of Roman and Flagg, the latter producing considerably more sales than the former.   Although the demand for petitioner's product was increased as a result of the war effort and consequent Government purchases, the evidence shows that it was necessary to go out and compete for the Government business.   The evidence also shows that it entailed more effort and time than commercial business.   Such business was gotten primarily by Flagg.   That the sales were of benefit to petitioner is shown by its increase in net profits.   Petitioner operated at a net loss in 1937, 1938, and 1939.   Its net profits in 1940 to 1943, inclusive, were as follows: $2,041.81, $43,338.14, $455,276.82, and $366,338.41.

Whether compensation is reasonable or unreasonable in amount is a question of fact.   Each case is to be determined upon its own peculiar facts.   Where such question is involved, as stated in *Wood Roadmixer Co.*, 8 T. C. 247, cited by respondent, prior decisions dealing with the same question "are not of great value as precedents."   In that case the salaries paid to two shareholders owning all but two shares of the stock of taxpayer were based primarily on net earnings of taxpayer for the year and were out of line with compensation previously paid, and the services rendered by them were but a little more, if any, in the taxable year than those rendered in prior years.

Upon consideration of all the evidence, noting that the payments were pursuant to the 1939 agreement, that the increase in business was primarily due to Government contracts for which Flagg was chiefly responsible, that the percentage paid and the selling arrangement were customary in the trade, and that there was no concealment from or

fraud upon the stockholders, it is our conclusion that respondent erred in disallowing part of the commissions paid to Roman and that he was not justified in holding that the part of the Roman commissions paid by Roman to Flagg represented unreasonable compensation paid by petitioner to Flagg. The action of respondent in disallowing $31,-557.86, $83,658.49, and $79,088.48 of the claimed deductions for sales commissions was erroneous.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

BLACK, LEECH, and HILL, *JJ*., dissent.